UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. |
| | : | |
| v. | : | VIOLATION: |
| | : | 18 U.S.C. § 1349 (Conspiracy to |
| PT BUKIT MURIA JAYA, | : | Commit Bank Fraud) |
| | : | |
| | : | FORFEITURE: 21 U.S.C. § 853(p); |
| Defendant. | : | 18 U.S.C. § 982(a)(2)(A) |

**I N F O R M A T I O N**

The United States Attorney charges that:

**GENERAL ALLEGATIONS**

**A.   Entities**

1. PT BUKIT MURIA JAYA ("BMJ") was incorporated in Indonesia and sold paper and paper products, including cigarette paper materials, to customers worldwide, including companies in South Asia and South East Asia.

2. North Korean Company 1 was a state-run tobacco company located in Pyongyang, North Korea. North Korean Company 1 manufactured cigarette products for sale in North Korea using non-tobacco material supplied by BMJ.

3. Chinese Trading Company 1 was a materials trading company located in Dandong, China, which participated in the scheme. North Korean Company 2 consigned the cigarette paper supply shipping transactions between BMJ and Chinese Trading Company 1. North Korean Company 2 was an alias for Korea Daesong General Trading Corporation ("Korea Daesong"), a company which the Office of Foreign Assets Control ("OFAC") designated in November of 2010 for being owned or controlled by Office 39 of the Korean Workers' Party. OFAC noted that Korea Daesong was used to facilitate foreign transactions on behalf of Office 39.

1

## B. Bank Secrecy Act Criminalizes Correspondent Banking With North Korean Financial Institutions

4. Foreign financial institutions maintain U.S. dollar bank accounts ("Correspondent Accounts") at banks in the United States ("Correspondent Banks"). Correspondent Accounts are broadly defined to include any account established for a foreign financial institution to receive deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution. See 31 C.F.R. § 1010.605. Correspondent Banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars and to conduct currency conversions to/from U.S. dollars. It is through these Correspondent Accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

5. According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships. To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act as well as sanctions programs administered by OFAC. The Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system from illicit use.

6. On March 15, 2016, the President issued Executive Order 13722 to address the Government of North Korea's continuing pursuit of its nuclear and missile programs. Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations." See 31 C.F.R. § 510.101 et seq. Executive Order 13722 and the North

Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC.

7. The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures when dealing with foreign financial institutions engaged in correspondent banking of U.S. dollar transactions.

8. The Bank Secrecy Act broadly defines foreign financial institutions to include dealers of foreign exchange and money transmitters in a manner not merely incidental to their business. *See* 31 C.F.R. § 1010.605(f).

9. Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A as part of the Bank Secrecy Act, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns. A Section 311 finding and the related special measure are implemented through various orders and regulations incorporated into 31 C.F.R. Chapter X. One such special measure imposed under Section 311 protects the integrity of the U.S. financial system by prohibiting financial institutions from causing U.S. financial institutions to engage in any type of financial transaction with any entity within the jurisdiction deemed an area of money laundering concern.

10. On June 1, 2016, FinCEN issued a Notice of Finding for a Section 311 designation of North Korea. Specifically, FinCEN's finding deemed *the entire North Korean financial sector* as a jurisdiction of primary money laundering concern. *See* Federal Register, Vol. 81, No. 107 (June 3, 2016).

11. In November 2016, FinCEN published a final rule implementing the most severe special measure against the entire North Korean financial sector. *See* Federal Register, Vol. 81, No. 217 (Nov. 9, 2016); 31 C.F.R. § 1010.659. The special measure bars U.S. financial institutions

from maintaining a correspondent account for any North Korean financial institution or any party acting on its behalf.  A second special measure requires covered financial institutions to exercise "enhanced due diligence" and to take reasonable steps not to process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves a North Korean financial institution.  Because of the finding that the entire North Korea financial sector was a primary money laundering concern, FinCEN cut all North Korean financial institutions – and entities acting on their behalf – off from any trade in U.S. dollar transactions via correspondent banking.  The Chairman of the House Foreign Affairs Committee stated that the Section 311 designation "impacts all financial institutions, anywhere, who now have a choice to make between doing business with North Korea and being cut off from financial transactions with the United States and the international financial system."

12. The North Korean financial sector is comprised of state-controlled financial institutions that use "front companies to conduct international financial transactions that support the proliferation of weapons of mass destruction (WMD) and the development of ballistic missiles in violation of international and U.S. sanctions," and are subject to "little or no bank supervision or anti-money laundering or combating the financing of terrorism [] controls."  81 Fed. Reg. at 78715.

        C.    **<u>Bank Fraud</u>**

13. As a result of the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, Correspondent Banks began in March 2016 refusing to process any U.S. dollar wire transactions involving entities in North Korea.

14. In turn, North Korean entities used front companies to pay their counterparties in U.S. dollars.  The use of front companies and stripping material information, such as the true

counterparties to the transaction, from wire transfer instructions influence the decision-making of the Correspondent Banks into processing transactions they otherwise normally would not, and thus constitutes bank fraud.

15. Correspondent Banks that processed transactions for North Korean customers would be subject to criminal and civil penalties for Bank Secrecy Act, anti-money laundering, and sanctions violations.

## **COUNT ONE**

16. Between in or about March 2016 and continuing thereafter up to and including in or about May 2018, within the District of Columbia and elsewhere, defendant BMJ, through certain of its non-executive sales employees, did knowingly combine, conspire, confederate, and agree with other persons both known and unknown:

   a. to knowingly execute and attempt to execute a scheme and artifice to defraud a financial institution, to wit, a U.S. correspondent bank; and

   b. to knowingly execute and attempt to execute a scheme and artifice to obtain monies, funds, and other property owned by, or under the custody or control of, said financial institution by means of false and fraudulent pretenses, representations, and promises.

### **Goals of the Conspiracy**

17. The goals of the conspiracy were:

   a. to enrich co-conspirators;

   b. to conduct transactions in U.S. dollars with North Korean entities otherwise barred from accessing the U.S. financial system; and

   c. to facilitate the purchase of tobacco-related products for North Korean end

users.

## Manner and Means of the Conspiracy

18. The manner and means by which certain non-executive sales employees of the defendant and its co-conspirators sought to accomplish the goals of the conspiracy, included, among others, the following:

    a. the defendant and co-conspirators agreed to export tobacco-related products to North Korea;

    b. defendant and co-conspirators used a non-transparent method of payment, namely, using front companies, to conceal the involvement of North Korean entities, and in so doing deceiving financial institutions in the United States to process payments; and

    c. defendant and co-conspirators in some circumstances listed false end destinations and customers on shipping documents in order to conceal the true destinations and end users.

## Overt Acts

19. In furtherance of the conspiracy and to achieve the goals and purposes thereof, the defendant and co-conspirators, both known and unknown to the United States, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

    a. On or about September 14, 2017, North Korean Company 1 caused false shipping documents to be completed, which indicated that PT BUKIT MURIA JAYA was shipping products to Dalian Sun Moon Star International Logistics Co. Ltd. (who was subsequently designated by

        OFAC in August 2018), when in fact the shipment was to North Korean Company 1.

    b.    On or about May 8, 2018, BMJ received a payment of approximately $65,310.00 from North Korean Company 1, via a North Korean front company.

    c.    On or about May 15, 2018, BMJ received a payment of approximately $42,560.00 from Chinese Trading Company 1 via a North Korean front company.

(**Conspiracy to Commit Bank Fraud**, in violation of Title 18, United States Code, Section 1349)

## FORFEITURE ALLEGATION

1.    Upon conviction of the offense alleged in Count One of this Information, the defendant shall forfeit to the United States any property constituting or derived from proceeds obtained directly or indirectly, as a result of this offense, pursuant to Title 18, United States Code, Section 982(a)(2)(A). The United States will also seek a forfeiture money judgment for a sum equal to the value of the property constituting or derived from proceeds obtained directly or indirectly, as a result of this offense.

2.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the Court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to 21 U.S.C. § 853(p).

    (**Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 982(a)(2)(A); and Title 21, United States Code, Section 853(p))

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
N.Y. Bar No. 4444188

By: _____
Michael P. Grady
Assistant United States Attorney

David C. Recker
Trial Attorney
National Security Division