**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | **NO.**  21-cr-14 |
| | : | |
| **PT BUKIT MURIA JAYA,** | : | |
| | : | |
| Defendant. | : | |

**DEFERRED PROSECUTION AGREEMENT**

Defendant PT Bukit Muria Jaya (the "Company"), by its undersigned representatives, and the United States Attorney's Office for the District of Columbia; and the United States Department of Justice, National Security Division (the "Offices"), enter into this deferred prosecution agreement (the "Agreement"), the terms and conditions of which are as follows:

**Criminal Information and Acceptance of Responsibility**

1.      The Company acknowledges and agrees that the Offices will file the attached one-count criminal Information in the United States District Court for the District of Columbia charging that certain non-executive sales employees of the Company knowingly entered into transactions that resulted in violations of the Bank Fraud Statute, in violation of Title 18, United States Code, Section 1349.  In so doing, the Company: (a) knowingly waives its right to indictment on these charges, as well as all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and Local Criminal Rule 45.1 of the United States District Court for the District of Columbia; and (b) knowingly waives any objection with respect to venue to any charges by the Offices arising out of the conduct described in the Statement of Facts attached hereto as

Attachment A, and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia.

2.      The Company admits, accepts, and acknowledges that it is responsible under United States *respondeat superior* law for the acts of its employees as charged in the Information, and as set forth in the Factual Statement attached hereto as Attachment A, which is incorporated herein by reference and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate.  If the Offices pursue a prosecution that is deferred by this Agreement, the Company stipulates to the admissibility of the Statement of Facts in any such proceeding, including any trial, guilty plea, civil forfeiture proceeding, or sentencing proceeding, and will not contradict anything in the Statement of Facts at any such proceeding.

<u>**Term of the Agreement**</u>

3.      This Agreement is effective for a period beginning on the date on which the Information is filed and ending 18 months from that date (the "Term").  The Company agrees, however, that, in the event the Offices determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the term of the Agreement may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 16 through 20 below.  Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirement in Paragraph 11, for an equivalent period.  Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirement in Paragraph 11,

and that the other provisions of this Agreement have been satisfied, the Term of the Agreement may be terminated early.

## Relevant Considerations

4.      The Offices enter into this Agreement based on the individual facts and circumstances presented by this case, including:

(a)     the nature and seriousness of the offense conduct, which involved financial institutions in the United States being deceived into processing international U.S.-dollar wires for front companies for North Korean entities;

(b)     the Company's willingness to acknowledge and accept responsibility under U.S. law for the actions of its employees as charged in the Information and as set forth in the Statement of Facts;

(c)     the Company's remediation efforts to date, including its comprehensive improvement of its U.S. sanctions laws and regulations compliance program;

(d)     the Company's willingness to settle any and all civil and criminal claims currently held by the Offices for any act within the scope of the Statement of Facts;

(e)     the Company's cooperation with the Offices, including voluntarily making foreign employees available for interviews, and collecting, analyzing, and organizing voluminous evidence and information for the Offices;

(f)     the Company's commitment to continue its cooperation with the Offices as set forth in Paragraphs 5 and 6; and

(g)     The Company's assurances, through its undersigned counsel and corporate representative signing the DPA, that the Company has disclosed to the Offices all potential U.S. sanctions violations of which they are aware, no matter how preliminary the evidence, as of the date of the execution of this Agreement.

After considering (a) through (g) above, the Offices believe that an appropriate resolution of this case is a deferred prosecution agreement for the Company, including a fine of $1,561,570, which reflects a discount of approximately 13 percent off the bottom of the otherwise-applicable Sentencing Guidelines fine range.

## Future Cooperation and Disclosure Requirements

5.     The Company shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the Statement of Facts, at any time during the Term of this Agreement, subject to applicable law and regulations, until the date upon which all investigations and prosecutions arising out of such conduct are concluded, whether or not those investigations and prosecutions are concluded within the term specified in Paragraph 3.  At the request of the Offices, the Company shall also cooperate fully in any investigation by the Offices of the Company, the Company's parent company or affiliates, or any of its present or former officers, directors, employees, or any other related party, in any and all matters relating to the conduct described in this Agreement and Statement of Facts and other conduct related to bank fraud or U.S. sanctions violations investigated by the Offices or any other component of the Department of Justice at any time during the Term of this Agreement, subject to all applicable laws and regulations.  The Company's cooperation pursuant to this paragraph is subject to

applicable laws and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such assertions. The Company agrees that its cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a.      The Company shall truthfully disclose all factual information with respect to its activities, those of the Company's parent company and affiliates, and those of its present and former directors, officers, and employees, including any evidence or allegations and internal or external investigations, about which the Company has or at any time gains any knowledge or about which the Offices may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Offices, upon request, any document, record or other tangible evidence about which the Offices may inquire of the Company.

b.      Upon request of the Offices, the Company shall designate knowledgeable employees, or attorneys to provide to the Offices the information and materials described in Paragraph 5(a) above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

c.      The Company shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this paragraph shall include

identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

      d.    The Company shall use its good faith efforts to identify additional witnesses who, to the Company's knowledge, may have material information concerning this investigation, and notify the Offices.

      e.    With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Company consents to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government, of such materials as the Offices, in their sole discretion, shall deem appropriate.

      f.    The Company shall provide information, materials, and testimony as necessary or requested to identify or to establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any criminal or judicial proceeding.

6.    In addition to the obligations in Paragraph 5, during the Term of the Agreement, should the Company's board of directors, officers, senior management or legal and compliance personnel learn of non-frivolous evidence or credible allegations of any violation of U.S. bank fraud, money laundering, or sanctions laws or regulations by the Company or any of its employees acting within the scope of their employment, the Company shall timely report such evidence or allegations to the Offices.  The Company shall likewise bring to the Offices' attention any administrative, regulatory, civil, or criminal proceeding or investigation of the Company relating to bank fraud, money laundering, or sanctions laws of any other jurisdiction.  Nothing in this

Agreement shall be construed to require the Company to produce any information, documents, records or tangible evidence that are protected by the attorney-client privilege, the work product doctrine, or other applicable confidentiality, criminal or data protection laws, or are subject to the rules and regulations of the Company's regulators regarding the disclosure of confidential supervisory information, or to otherwise take any steps in violation of any applicable laws and regulations.

### Payment of Monetary Penalty

7.      The Offices and the Company agree that, based on the factors set forth in 18 U.S.C. § 3572(a) and 18 U.S.C. § 3571(d), a fine of $1,561,570 ("Fine Amount") is appropriate in this case.  The Company and the Offices agree that the Fine Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of the Company's conduct and the Company's lack of prior history of U.S.-criminal violations.  Any payments made toward satisfaction of the Fine Amount are final and shall not be refunded.  Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the Fine Amount is the maximum fine that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, it will recommend to the Court that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a future judgment relating to the conduct described in the Statement of Facts.  The Company acknowledges that no U.S. tax deduction may be sought in connection with the payment of any part of the Fine Amount.  The Company shall pay the Fine Amount no later than 60 days prior to the expiration of the Term of the Agreement, pursuant to payment instructions provided by the Offices in their sole discretion.

The Company releases any and all claims it may have to such funds, and further certifies that it passes clean title to these funds, which are not the subject of any lien, security agreement, or other encumbrance.  Transferring encumbered funds or failing to pass clean title to the funds in any way will be considered a breach of this agreement.  The Company shall indemnify the government for any costs it incurs associated with the passing of clean title to the funds.

### Conditional Release from Liability

8.     Subject to Paragraphs 16 through 20, the Offices agree, except as provided herein, that they will not bring any criminal or civil case against the Company relating to any of the conduct described in the Statement of Facts or the criminal Information filed pursuant to this Agreement.  The Offices, however, may use any information related to the conduct described in the attached Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.     This Agreement does not provide any protection for any criminal or civil case against the Company that is not related to the conduct described in the Statement of Facts or Information.

b.     This Agreement does not provide any protection against prosecution for any future conduct by the Company.

c.     In addition, this Agreement does not provide any protection against any prosecution of any individuals, regardless of their affiliation with the Company.

**Corporate Compliance Program**

9.      The Company represents that it has implemented and will continue to implement a compliance program designed to prevent and detect violations of U.S. sanctions laws and regulations, throughout its operations, including the operations of the Company's subsidiaries, and majority-owned or controlled joint ventures who engage in international wires processed through the United States or whose operations are subject to sanctions administered by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC").

10.      In order to address any deficiencies in its compliance program, the Company represents that it has undertaken, and will continue to undertake in the future, the following compliance obligations:

a.      Continue to not knowingly undertake any U.S. dollar transactions and currency conversions that transit the United States or any transactions involving U.S. persons, with individuals or entities on OFAC's Specially Designated Nationals and Blocked Persons list;

b.      Continue to not knowingly undertake any U.S. dollar transactions or currency conversions that transit the United States or any activities involving U.S. persons for, on behalf of, or in relation to any person or entity resident or operating in, or the governments of, Iran, North Korea, or Syria that is prohibited by U.S. law or OFAC regulations;

c.      Continue to complete global sanctions training, covering United States sanctions and trade control laws for all relevant employees, including, but not limited to, personnel within the sanctions compliance function, as well as relevant gatekeepers and business units.  The Company understands that it bears the burden of identifying relevant employees;

d.      Continue to apply and implement compliance procedures and training designed to ensure that the Company's compliance officer in charge of sanctions is made aware in a timely manner of attempts by any person or entity (including, but not limited to, the Company's employees, customers, financial institutions, companies, organizations, groups, or persons) to circumvent or evade U.S. sanctions laws, including, but not limited to, circumvention attempts involving deceptive business practices or suspected North Korean front companies;

e.      Abide by any and all requirements of the Settlement Agreement by and between OFAC and the Company regarding remedial measures or other required actions related to this matter;

f.      Within 30 days of the execution date of this Agreement, the Company shall notify those individuals with responsibility for sanctions compliance of the Company's compliance obligations under this Agreement and the criminal conduct admitted to in the Statement of Facts and shall certify to the Offices in the Company's first Semi-Annual Report (as required by Paragraph 11) that such notification has been completed and shall provide the Offices with a copy of such notice.

### Corporate Compliance Reporting

11.     For the Term of the Agreement, the Company shall provide the Offices with Semi-Annual Reports ("Semi-Annual Reports") describing the status of the Company's continued improvements to its compliance programs as required by this Agreement and the OFAC settlement. The first Semi-Annual Report shall be due 180 days after the filing of the Information, the second Semi-Annual Report shall be due 360 days after filing of the Information, and the final Semi-Annual Report shall be due 450 days after the filing of the Information. The Semi-Annual

Reports must include specific and detailed accounts of the Company's sanctions and compliance improvements and shall identify any violations of U.S. sanctions laws that have come to the attention of the Company's legal and compliance personnel during the reporting period.  In the event the Offices find that there exists a change of circumstances sufficient to eliminate the need for any portion of the reporting requirements set forth in this paragraph, the Offices may, in their sole discretion, choose to suspend or terminate the reporting requirements in whole or in part.  As the reports may include proprietary, financial, confidential, and competitive business information, and as public disclosure could impede government investigations, these reports shall remain non-public except as otherwise agreed to by the parties in writing.  The Offices in their sole discretion may determine that disclosure would further the discharge of their duties and responsibilities or is otherwise required by law, and under such circumstances may disclose the reports after providing the Company notice of their intent to disclose (but not the identity of party to whom the disclosure will be made) and an opportunity to be heard as to any necessary redactions or other concerns.

       12.    During the Term of this Agreement, the Offices, as they deem necessary and upon request to the Company, shall, subject to applicable laws and regulations: (a) be provided by the Company with access to any and all non-privileged books, records, accounts, correspondence, files, and any and all other documents or other electronic records, including emails, of the Company and its representatives, affiliates that it controls, and employees, relating to any matters described or identified in the Semi-Annual Reports; and (b) be permitted to interview any officer, employee, or representative of the Company concerning any non-privileged matter described or identified in the Semi-Annual Reports, and the Company shall use its best efforts to organize any such interview.

13.     The Company shall notify the Offices of any criminal, civil, administrative or regulatory investigation, inquiry, or action, of the Company or its current directors, officers, employees, representatives, and agents related to the Company's compliance with U.S. sanctions laws and regulations, to the extent permitted by the agency conducting the investigation or action and applicable laws and regulations, including, without limitation, rules and regulations regarding the disclosure of confidential supervisory information.   To the extent necessary to fulfill this requirement, the Company shall immediately seek the approval of such regulators to disclose such criminal, civil, administrative or regulatory investigation, inquiry or action to the Offices.   Subject to approval by its regulators, it is understood that the Company shall promptly notify the Offices of: (a) any deficiencies, failings, or matters requiring attention with respect to the Company's sanctions compliance program identified in an examination report by any regulator within 10 business days of approval from such regulator to share such information; and (b) any steps taken or planned to be taken by the Company to address the identified deficiency, failing, or matter requiring attention.

**Deferred Prosecution**

14.     In consideration of the undertakings agreed to by the Company herein, including: (a) past and future cooperation as described herein; (b) payment of a monetary penalty; and (c) remedial actions to date and the undertakings agreed to by the Company herein, the Offices agree that any prosecution of the Company relating to the conduct set forth in the Statement of Facts and the Information be, and hereby is, deferred for the Term of this Agreement.   To the extent there is conduct disclosed by the Company that does not concern any act specified in the

Statement of Facts or that was the subject of this investigation, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

15.     The Offices further agree that if the Company fully complies with all of its obligations under this Agreement, the Offices will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Within 30 days of the Agreement's expiration, or less at the discretion of the Offices, the Offices shall seek dismissal with prejudice of the Information filed against the Company described in Paragraph 1, and agrees not to file charges in the future against the Company based on the conduct described in this Agreement and the attached Statement of Facts.

**Breach of the Agreement**

16.     If, during the Term of this Agreement, the Company: (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its assurances about disclosure of any violations of U.S. bank fraud, money laundering, or sanctions laws or regulations by the Company or any of its employees known to the Company as of the execution date of this Agreement, and disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraphs 5 and 6 of this Agreement; (d) fails to implement a compliance program as set forth in Paragraph 9 of this Agreement; or (e) otherwise fails specifically to perform or to fulfill completely each of the Company's obligations under the Agreement, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Offices in the United States District Court for the District of Columbia or any other

appropriate venue.  Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Offices' sole discretion.  Any such prosecution may be premised on information provided by the Company.  Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement, subject to any tolling agreements between the Offices and the Company, may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the execution date of this Agreement and the expiration of the Term plus one (1) year.  Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year.  In addition, the Company agrees that the statute of limitations as to any violation of federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term, plus one year, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

17.     In the event the Offices determine that the Company has breached this Agreement, the Offices agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach.  Within 30 days of receipt of such notice, the Company shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and

remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Company.

18.     In the event that the Offices determine that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company to the Offices or to the Court, including the attached Statement of Facts, and any testimony given by the Company before a grand jury or a court, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible.  The decision whether the conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Offices.

19.     The Company acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.   The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

20.     No later than 90 days prior to the expiration of the Term of this Agreement, and again on the date of the expiration of the Term of this Agreement, the Company, through its Head of Compliance, will certify to the Offices that, in good faith reliance on information provided to the Head of Compliance by key employees within the Company, based upon their information and belief, the Company has met its disclosure obligations under Paragraph 11 of this Agreement.  Any certification made pursuant to this Paragraph shall be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Section 1001, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

<u>**Sale or Merger of Company**</u>

21.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it sells, merges, or transfers business operations or assets that are material to the Company's consolidated operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, or transfer, it shall include in any contract for sale, merger, or transfer, a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement.  The purchaser or successor in interest must also agree in writing that the Offices' ability to declare a breach under this Agreement is applicable also in full force to that entity.  The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void.  The Company shall provide notice to the Offices at least 30 days prior to undertaking any such sale, merger, or transfer.  The Offices shall also notify the

Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Agreement, the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

## Public Filing

22.     The Company and the Offices agree that this Agreement (and its attachments) shall be publicly filed in the United States District Court for the District of Columbia.

## Public Statements by Company

23.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, or any other person authorized to speak for the Company make any public statement, in U.S. litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 16 through 20 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the

sole discretion of the Offices.  If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Offices shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within 14 business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, or employee of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

24.     The Company agrees that if it, its parent company, or any of its direct or indirect subsidiaries or affiliates it controls issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Company; and (b) whether the Offices have any objection to the release.  Statements by the Company, its parent, its direct or indirect subsidiaries, or affiliates it controls at any press conference concerning this matter shall not be inconsistent with such a press release.

25.     The Offices agree, if requested to do so, to bring to the attention of law enforcement, regulatory authorities, and non-governmental entities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such entities,

the Offices are not agreeing to advocate on behalf of the Company, but rather are agreeing to provide facts to be evaluated independently by such entities.

### Limitations on Binding Effect of Agreement

26.     This Agreement is binding on the Company and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.  Nothing in this Agreement restricts in any way the ability of the Offices, any other federal department or agency, or any state or local government from proceeding criminally, civilly, or administratively, against any current or former directors, officers, or employees of the Company or against any other entities or individuals.   The parties to this Agreement intend that the Agreement does not confer or provide any benefits, privileges, immunities, or rights to any other individual or entity other than the parties hereto.

**Notice**

27.    Any notice to the Offices under this Agreement shall be given by personal delivery,

overnight delivery by a recognized delivery service, or registered or certified mail, with a copy by

email, addressed to:

>    Jay I. Bratt, Chief
>    Counterintelligence and Export Control Section
>    National Security Division
>    U.S. Department of Justice
>    950 Pennsylvania Ave, NW, Suite 7700d
>    Washington, DC 20005
>    jay.bratt@usdoj.gov
>
>    and:
>
>    Gregg Maisel, Chief
>    National Security Section
>    U.S. Attorney's Office for the District of Columbia
>    555 4th Street, NW
>    Washington, DC 20530
>    gregg.maisel@usdoj.gov

Any notice to the Company under this Agreement shall be given by personal delivery, overnight

delivery by a recognized delivery service, or registered or certified mail, addressed to:

>    M. Kendall Day
>    Gibson, Dunn & Crutcher LLP
>    1050 Connecticut Avenue NW
>    Washington, DC 20036
>
>    With copies via email to:
>
>    PT Bukit Muria Jaya:         iputu.kertayasa@bmjpaperpack.com
>
>    Gibson Dunn:                 kday@gibsondunn.com

Notice shall be effective upon actual receipt by the Offices or the Company.

## Execution in Counterparts

28.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.  Further, all facsimile and digital images of signatures shall be treated as originals for all purposes.  The execution date shall be the last date when all signatories have signed the Agreement.

## Complete Agreement

29.     This Agreement, including its attachments, sets forth all the terms of the Agreement between the Company and the Offices.  There are no promises, agreements, or conditions that have been entered into other than those expressly set forth in this Agreement, and none shall be entered into and/or be binding upon the Company or the Offices unless signed by the Offices, the Company's attorneys, and a duly authorized representative of the Company.  This Agreement supersedes any prior promises, agreements, or conditions between the Company and the Offices.  The Company agrees that it has the full legal right, power, and authority to enter into and perform all of its obligations under this Agreement and it agrees to abide by all terms and obligations of this Agreement as described herein.  No amendments, modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the Company and a duly authorized representative of the Company.

**ACCEPTED AND AGREED TO:**

**FOR PT BUKIT MURIA JAYA:**

Date: 14 Jun 2021     By: _____

I Putu Kertayasa
Head of Compliance
PT Bukit Muria Jaya


Date: _____     By: _____

M. Kendall Day
Gibson, Dunn & Crutcher LLP


Date: _____     By: _____

William F. Savarino
Cordatis LLP

**ACCEPTED AND AGREED TO:**

**FOR PT BUKIT MURIA JAYA:**

Date: _____         By: _____
                                 I Putu Kertayasa
                                 Head of Compliance
                                 PT Bukit Muria Jaya


Date: _01/14/2021_____       By: _____
                                 M. Kendall Day
                                 Gibson, Dunn & Crutcher LLP


Date: _____         By: _____
                                 William F. Savarino
                                 Cordatis LLP

Case 1:21-cr-00014-RC   Document 3   Filed 01/14/21   Page 23 of 40

**ACCEPTED AND AGREED TO:**

**FOR PT BUKIT MURIA JAYA:**

Date: _____    By: _____
                              I Putu Kertayasa
                              Head of Compliance
                              PT Bukit Muria Jaya

Date: _____    By: _____
                              M. Kendall Day
                              Gibson, Dunn & Crutcher LLP

Date: 1/13/21            By: _____
                              William F. Savarino
                              Cordatis LLP

Case 1:21-cr-00014-RC   Document 3   Filed 01/14/21   Page 24 of 40

- 22 -

**FOR THE DEPARTMENT OF JUSTICE:**

MICHAEL R. SHERWIN
ACTING UNITED STATES ATTORNEY
FOR THE DISTRICT OF COLUMBIA

Date: 1/14/2021          By: _____

Michael P. Grady
Assistant U.S. Attorney


JOHN DEMERS
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

Date: 1/14/2021          By: _____

David C. Recker
Trial Attorney
Counterintelligence and Export Control Section

## CERTIFICATE OF CORPORATE RESOLUTIONS

WHEREAS, PT Bukit Muria Jaya (the "Company") has been engaged in discussions with the United States Attorney's Office for the District of Columbia, and United States Department of Justice, National Security Division (collectively, the "Offices") regarding issues arising in relation to historical violations of U.S. bank fraud laws; and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices; and

WHEREAS, the Company's President, together with outside counsel for the Company, have advised the Board of Directors of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Board has RESOLVED that:

1.      The Company: (a) acknowledges the filing of the one-count Information charging that certain non-executive sales employees of the Company knowingly entered into transactions that resulted in violations of the Bank Fraud Statute, in violation of Title 18, United States Code, Section 1349; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Offices; (c) agrees to accept a monetary penalty against the Company totaling $1,561,570, and to pay such penalty to the United States Treasury with respect to the conduct described in the Information;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to: (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any

charges by the Offices arising out of the conduct described in the attached Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the District of Columbia; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the attached Statement of Fact or relating to conduct known to the Offices prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

3.      The Head of Compliance of the Company, I Putu Kertayasa, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement;

4.      The Head of Compliance of the Company, I Putu Kertayasa, is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.    All of the actions of the Head of Compliance of the Company, I Putu Kertayasa, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date: _Jan 14TH, 2021_          By: _____

Liem Khe Fung
Director
PT Bukit Muria Jaya

**CERTIFICATE OF COUNSEL**

I am counsel for PT Bukit Muria Jaya (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the President of the Company. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the President of the Company. I have fully advised the President of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: 01/14/2021

By: M. Kendall Day
Gibson, Dunn & Crutcher LLP

Case 1:21-cr-00014-RC Document 3 Filed 01/14/21 Page 29 of 40

By:
William Savarino
Cordatis LLP

Counsel for the Company

## CERTIFICATE OF COUNSEL

I am counsel for PT Bukit Muria Jaya (the "Company") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the President of the Company. Based on our review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of this Agreement with the President of the Company.  I have fully advised the President of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into this Agreement.  To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date   January 14, 2021

By: _____
     M. Kendall Day
     Gibson, Dunn & Crutcher LLP

By: _____
     William Savarino
     Cordatis LLP

     Counsel for the Company

- 27 -

ATTACHMENT A

[Statement of Facts]

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **NO.**  21-cr-14 |
| | : | |
| **PT BUKIT MURIA JAYA,** | : | |
| | : | |
| **Defendant.** | : | |

## STATEMENT OF FACTS

This Factual Statement is made pursuant to, and is part of, the Deferred Prosecution Agreement dated January 14, 2021, between the United States Attorney's Office for the District of Columbia, the United States Department of Justice, National Security Division (collectively, "DOJ") and PT Bukit Muria Jaya ("BMJ" or the "Company").  BMJ hereby agrees and stipulates that the following information is true and accurate.  BMJ admits, accepts, and acknowledges that it is responsible under United States *respondeat superior* law for the acts of its employees as set forth below.  Should DOJ pursue the prosecution that is deferred by this Agreement, BMJ agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding.  The following facts establish beyond a reasonable doubt the charge set forth in the criminal Information attached to this Agreement, and set forth below.  All conduct discussed in this Factual Statement occurred on or about the dates described.

## I.    STATUTORY BACKGROUND

### A.    Bank Secrecy Act Criminalizes Correspondent Banking With North Korean Financial Institutions

1.    Foreign financial institutions maintain U.S. dollar bank accounts ("Correspondent Accounts") at banks in the United States ("Correspondent Banks").  Correspondent Accounts are broadly defined to include any account established for a foreign financial institution to receive

deposits from, or to make payments or disbursements on behalf of, the foreign financial institution, or to handle other financial transactions, such as currency conversions, related to such foreign financial institution.   See 31 C.F.R. § 1010.605.   Correspondent Banks serve to support international wire transfers for foreign customers in a currency that the foreign customer's overseas financial institution normally does not hold on reserve, such as U.S. dollars and to conduct currency conversions to/from U.S. dollars.  It is through these accounts that the funds used in U.S. dollar transactions clear and/or are converted into other currencies.

2.      According to the Treasury Department, the global financial system, trade flows, and economic development rely on correspondent banking relationships.  To protect this system from abuse, U.S. financial institutions must comply with national anti-money laundering requirements set forth in the Bank Secrecy Act as well as sanctions programs administered by OFAC.  The Financial Crimes Enforcement Network ("FinCEN") is responsible for administering the Bank Secrecy Act in furtherance of its mission to safeguard the U.S. financial system from illicit use.

3.      On March 15, 2016, the President issued Executive Order 13722 to address the Government of North Korea's continuing pursuit of its nuclear and missile programs.  Pursuant to that authority, on March 16, 2016, the Secretary of the Treasury promulgated the "North Korea Sanctions Regulations."  See 31 C.F.R. § 510.101 et seq.  Executive Order 13722 and the North Korea Sanctions Regulations prohibit the export of financial services from the United States or by any U.S. person to North Korea, unless exempt or authorized by OFAC.

4.      The Bank Secrecy Act requires U.S. financial institutions to take anti-money laundering measures when dealing with foreign financial institutions engaged in correspondent banking of U.S. dollar transactions.

5.      The Bank Secrecy Act broadly defines foreign financial institutions to include dealers of foreign exchange and money transmitters in a manner not merely incidental to their business.  *See* 31 C.F.R. § 1010.605(f).

6.      Section 311 of the USA PATRIOT Act, codified at 31 U.S.C. § 5318A as part of the Bank Secrecy Act, gives FinCEN a range of options, called special measures, that can be adapted to target specific money laundering and terrorist financing concerns.  A Section 311 finding and the related special measure are implemented through various orders and regulations incorporated into 31 C.F.R. Chapter X.  One such special measure imposed under Section 311 protects the integrity of the U.S. financial system by prohibiting financial institutions from causing U.S. financial institutions to engage in any type of financial transaction with any entity within the jurisdiction deemed an area of money laundering concern.

7.      On June 1, 2016, FinCEN issued a Notice of Finding for a Section 311 designation of North Korea.  Specifically, FinCEN's finding deemed *the entire North Korean financial sector* as a jurisdiction of primary money laundering concern.  *See* Federal Register, Vol. 81, No. 107 (June 3, 2016).

8.      In November 2016, FinCEN published a final rule implementing the most severe special measure against the entire North Korean financial sector.  *See* Federal Register, Vol. 81, No. 217 (Nov. 9, 2016); 31 C.F.R. § 1010.659.  The special measure bars U.S. financial institutions from maintaining a correspondent account for any North Korean financial institution or any party acting on its behalf.  A second special measure requires covered financial institutions to exercise "enhanced due diligence" and to take reasonable steps not to process a transaction for the correspondent account of a foreign bank in the United States if such a transaction involves a North Korean financial institution.  Because of the finding that the entire North Korea financial sector

- 3 -

was a primary money laundering concern, FinCEN cut all North Korean financial institutions –

and entities acting on their behalf – off from any trade in U.S. dollar transactions via correspondent

banking.   The Chairman of the House Foreign Affairs Committee stated that the Section 311

designation "impacts all financial institutions, anywhere, who now have a choice to make between

doing business with North Korea and being cut off from financial transactions with the United

States and the international financial system."

        9.     A bank that willfully and intentionally violates the Section 311(b) special measure,

codified at 31 U.S.C. § 5318A(b), or of the regulations published at 31 C.F.R. § 1010.659, is

punishable criminally pursuant to 31 U.S.C. § 5322.

        10.    The North Korean financial sector is comprised of state-controlled financial

institutions that use "front companies to conduct international financial transactions that support

the proliferation of WMD and the development of ballistic missiles in violation of international

and U.S. sanctions," and are subject to "little or no bank supervision or anti-money laundering or

combating the financing of terrorism [] controls."  81 Fed. Reg. at 78715.

        11.    The United Nations Panel of Experts found that once North Korea could register a

front company without overt links to the country through the assistance of foreign nationals, it

became significantly easier for its firms to pass rudimentary due diligence checks by financial

institutions and open and maintain bank accounts.

B.    **Bank Fraud**

12.    The Government is not required to prove that a defendant intended to cause financial harm, nor that the defendant ultimately caused harm to a financial institution.

13.    Exposing a bank to a risk of loss establishes liability under the bank fraud statute. It is not required to evaluate whether the scheme would create a substantial likelihood of risk of loss to a bank to support a bank fraud conviction.  Rather, all that is needed is that the scheme placed the financial institution at risk of civil liability or financial loss.

14.    As a result of the North Korea Sanctions Regulations, the FinCEN 311 action, and overall risk management, Correspondent Banks began in March 2016 refusing to process any U.S. dollar wire transactions involving entities in North Korea.

15.    In turn, North Korean entities used front companies to pay their counterparties in U.S. dollars.  The use of front companies and stripping material information, such as the true counterparties to the transaction, from wire transfer instructions influence the decision-making of the Correspondent Banks into processing transactions they otherwise normally would not, and thus constitutes bank fraud.

16.    Correspondent Banks that processed transactions for North Korean customers would be subject to criminal and civil penalties for Bank Secrecy Act, anti-money laundering, and sanctions violations.

II.   **ENTITIES**

17.     BMJ was incorporated in Indonesia and sold paper and paper products, including cigarette paper materials, to customers worldwide.

18.     North Korean Company 1 was a state-run tobacco company located in Pyongyang, North Korea.  North Korean Company 1 manufactured cigarette products for sale in North Korea using non-tobacco material supplied by BMJ.  BMJ sold products to North Korean Company 1 until May 2018, when a Correspondent Bank in the United States froze a payment by a North Korean Company 1 front company.   In September and October of 2017, two North Korean Company 1 shipments were sent to Dalian Sun Moon Star International Logistics CO LTD., which was subsequently designated in August of 2018.

19.     Chinese Trading Company 1 was a materials trading company located in Dandong, China, which participated in the scheme.  North Korean Company 2 consigned the cigarette paper supply shipping transactions between BMJ and Chinese Trading Company 1.   North Korean Company 2 was an alias for Korea Daesong, a company which was designated as an SDN in November of 2010.

**The Scheme**

20.     BMJ was unaware that U.S. sanctions prohibited the use of the U.S. financial system by North Korean entities subsequent to March 15, 2016.

21.     BMJ was aware that its sales to North Korean Company 1 and Chinese Trading Company 1 were destined for North Korea.

22.     Upon learning in May 2018 that U.S. sanctions applied to its transactions with North Korean Company 1, North Korean Company 2, and Chinese Trading Company 1, BMJ immediately stopped all transactions involving any customers in North Korea.  BMJ's revenue

from sales to North Korea from March 2016 until May 2018 (the "Relevant Time Period") was less than 0.3 percent of its total sales revenue during the same period.

23.     During the Relevant Time Period, Correspondent Banks in the United States would not process U.S. dollar wire transfers on behalf of customers located in North Korea.

24.     As a result, the North Korean customers used front companies to mislead the Correspondent Banks, who are regulated by the Federal Reserve Board and the Office of Comptroller of Currency, both of which are located in Washington, D.C., as to the true nature of the transactions involved (*i.e.*, deliveries intended for North Korea, not the front companies, largely based out of China).

25.     In December 2015, North Korean Company 1 advised certain non-executive sales employees of BMJ that it could not pay BMJ directly.  In August 2017, North Korean Company 1 also advised certain non-executive sales employees of BMJ that it was having difficulties paying BMJ and needed to find an alternative route for doing so.

26.     North Korean Company 1 and Chinese Trading Company 1 requested that BMJ accept payments from third party companies that were not involved in BMJ's sales to North Korean Company 1 and Chinese Trading Company 1, and BMJ agreed.  At the request of North Korean Company 1 and Chinese Trading Company 1, BMJ also agreed to ship products to other entities designated by its North Korean customers.  Certain non-executive sales employees of BMJ understood that these agreements would prevent banks from easily learning that the transactions involved North Korean entities.

27.     Neither the North Koreans nor BMJ made any affirmative statements to the foreign banks or the Correspondent Banks in the United States, which processed these transactions.  BMJ was never asked by any bank to provide due diligence documentation regarding these transactions.

28.     Banks did not know to question the transactions at issue, because the transactions were in the name of front companies with no apparent ties to North Korea.

29.     Each transaction that transited through a Correspondent Bank in the United States included an omission by North Korean Company 1, North Korean Company 2, or Chinese Trading Company 1 (i.e., the failure to affirmatively disclose to the bank who the front company was actually acting on behalf of).  Each such omission was an overt act in the scheme to defraud the banks.

30.     The use of these front companies as payors tricked the Correspondent Banks into processing transactions that they would not have otherwise processed.  That is, the Correspondent Banks would have rejected the transactions in question had they been made in the name of the true customers.

31.     Correspondent Banks in the United States were thus defrauded by the use of front companies to make payments, which in so doing concealed the nexus to North Korea.

32.     These financial transactions occurred in Indonesia, China, and the United States.

**Representative Transactions with North Korean Company 1**

33.     During the Relevant Time Period, North Korean Company 1 made several U.S. dollar wire transfers to BMJ.  North Korean Company 1 made each payment via a front company, whose identity concealed the nexus to North Korea.  North Korean Company 1 made several payments totaling at least $257,759.00 to BMJ via eight front companies.  A Correspondent Bank froze the last payment to BMJ from North Korean Company 1, dated May 8, 2018.

34.     At North Korean Company 1's request, starting September 2017, other companies were listed on shipping documents, which permitted North Korean Company 1 to conceal that the goods were destined for North Korea.  Concealment tactics employed by North Korean Company

1 included the use of a logistics company located in Dalian, China as the "Notify Party" and a South Korean entity as the consignee for two of the North Korean shipments. OFAC subsequently designated the Dalian, China entity for its dealing with North Korea.

**Representative Transactions with Chinese Trading Company 1**

35.     Chinese Trading Company 1 contacted BMJ to purchase cigarette paper on behalf of North Korean Company 2.  Originally, the shipments listed North Korean Company 2 on the shipping documents.

36.     During the Relevant Time Period, Chinese Trading Company 1 made several U.S. dollar wire transfers to BMJ.  Chinese Trading Company 1 made payments via front companies, whose identities concealed the nexus to North Korea.  In total, Chinese Trading Company 1 made payments totaling at least $576,904.00 to BMJ via 11 front companies.  A Correspondent Bank froze the last payment to BMJ from Chinese Trading Company 1, dated May 15, 2018.

37.     Until July 2017, BMJ's shipping documents listed a North Korean company as the "Ship to" and "Consignee."   After this date, Chinese Trading Company 1 began to use other companies on shipping documents which hid the fact that the goods were destined for North Korea.